IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JACQUELINE JONES,                   §
                                    §
        Plaintiff,                  §
                                    §
V.                                  §        CIVIL ACTION NO. H-07-2310
                                    §
MICHAEL J. ASTRUE, COMMISSIONER     §
OF THE SOCIAL SECURITY              §
ADMINISTRATION,                     §
                                    §
        Defendant.                  §

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 14) and Plaintiff's Cross-Motion for Summary Judgment (Document No. 15). Having considered the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

## I.      Introduction

---

[1]

        On October 18, 2007, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 12.

Plaintiff Jacqueline Jones ("Jones") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income. Jones argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision that she has the "residual functional capacity to [perform] medium work with no detailed or complex [instructions] at a non-assembly line pace, and only occasional interaction with the general public." (Tr. 17). In addition, Jones maintains that the ALJ erred by not applying the appropriate criteria adopted by the Social Security Administration ("SSA"), failed to look more closely at her allegations of mental impairment as evidenced by her I.Q. scores, and failed to properly consider those allegations with respect to her depression and other psychological problems. The Commissioner, in contrast, contends that there is substantial evidence in the record to support the ALJ's decision that Jones could engage in some work. Furthermore, the Commissioner argues that the ALJ applied the proper criteria for disability and appropriately evaluated, in light of the material facts involving her credibility, Jones' I.Q. scores and depression in determining the extent of her mental impairments.

## II.    Administrative Proceedings

On July 12, 2004, Jones applied for supplemental security income ("SSI"), claiming that she became totally and permanently disabled beginning May 1, 2004, as a result of various physical and mental impairments, including back problems, a learning disability, memory loss, hypertension, and a history of stroke. (Tr. 83-85, 139).[2] The SSA denied her application at the

---

[2]

"Tr." refers to the transcript of the administrative record.

initial and reconsideration stages.  After that, Jones requested a hearing before an ALJ.  The SSA granted her request and the ALJ, Earl W. Crump, held a hearing on July 27, 2006, at which Jones' claims were considered *de novo*.  (Tr. 14-19).  On August 25, 2006, the ALJ issued his decision finding Jones not disabled.  (Tr. 14-19).

Jones sought review of the ALJ's adverse decision with the Appeals Council.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 404.970; 20 C.F.R. § 416.1470.  After considering Jones' contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on May 18, 2007, that there was no basis upon which to grant Jones' request for review.  (Tr. 5-7).  The ALJ's findings and decision thus became final.

Jones filed a timely appeal of the ALJ's decision.  Both Jones and the Commissioner have filed Motions for Summary Judgment (Document Nos. 14 & 15).  This appeal is now ripe for ruling.

**III.  Standard for Review of Agency Decision**

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision:

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

4

## IV.   Burden of Proof

An individual claiming entitlement to supplemental security income based on disability under the Act has the burden of proving his disability. *Johnson,* 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.         § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1.   If the claimant is presently working, a finding of "not disabled" must be made;

2.   If the claimant does not have a "severe impairment" or combination of impairments, [she] will not be found disabled;

3.   If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.      If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.      If  the claimant's impairment prevents [her] from doing any other substantial gainful activity, taking into consideration [her] age, education, past work experience and residual functional capacity, [she] will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999).  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *Id.*  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett,* 67 F.3d at 564.

Here, the ALJ concluded at step two that Jones had medically-severe impairments as follows: back pain, hypertension, status post cerebral vascular accident ("CVA" or "stroke"), major depression, and borderline intellectual functioning.  (Tr. 16).  However, at step three, the ALJ did not find that any of Jones' impairments, standing alone or in combination, satisfied the criteria of any of the Commissioner's Listing of Impairments located in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2006).  (Tr. 16-17).  The ALJ also concluded at step four and step five that Jones was able to perform her past work as a garment sorter and healthcare provider and had the residual functional capacity ("RFC")  to engage in medium work that required no detailed or complex instructions or tasks, that did not require an assembly-line pace, and that involved no more than

occasional interaction with the general public.  (Tr. 17).  In evaluating Jones' RFC, the ALJ also made a determination of the credibility of Jones' subjective complaints.  (Tr. 17-18).  His determination was made, in part, based upon a fraud investigation and the inconsistent statements made by Jones during the hearing, notwithstanding Jones' argument that the inconsistency could be explained by her low I.Q. and said mental impairments (Tr. 17-18).  In this appeal, the issues presented by Jones are: (1)  whether the ALJ properly applied the correct criteria in resolving evidence of mental impairments as evinced by the I.Q. scores and psychological assessments; (2)  whether the ALJ erred in determining that the subjective allegations of pain were questionable considering inconsistency on Jones' part; and (3)  whether there is substantial evidence that Jones can not only do her past work as a garment sorter and health care provider, but is also capable to engage in other work.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1)  the objective medical facts; (2)  the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3)  subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4)  the plaintiff's educational background, work history and present age.  *Wren,* 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Facts

The objective medical facts show that Jones suffers from hypertension, depression, obesity, high cholesterol, peripheral neuropathy, post status cerebrovascular accident, post stroke depression, shoulder pain and lower back pain.  Jones claims disability based on a combination

of all the impairments above.  In her application for SSI benefits, Jones claims that her disability

began on May 1, 2004.  (Tr. 83).

In May 2004, Jones suffered a cerebrovascular accident, or stroke.  She was admitted to

the care of attending physician James Grotta, M.D. at Memorial Hermann Hospital in Houston,

Texas on May 8, 2004.  (Tr. 171, 174).  Details of the event are found in the discharge summary:

> Brief History: This patient presented on 05/08/2004.  She is a 49-year old African-
> American female with a history of hypertension, hyperlipidemia, who has been off of her
> hypertension medications for a week secondary to funding issues.  Last night again, she
> noticed that she had left arm weakness and numbness as well as slurring of her speech.
> As the symptoms persisted, she decided to seek medical assistance.  No visual changes
> today. (Tr. 171).

The discharge summary also mentions her social history which includes tobacco smoking

and alcohol usage.  It is noted that she does not abuse drugs.  In the report the physician also

included the following explanation of his objective medical findings and Jones' course of

treatment:

> Physical Examination:
> The patient presented neurologically alert, oriented times three with positive dysarthria,
> positive left upper extremity drift.  Pupils are equal, round and reactive to light.
> Extraocular muscles are intact.  She also had left facial droop.  She had some sensory
> extinction in the left upper extremity.  Left lower extremity with 4+/5 strength.  Right
> upper extremity and right lower extremity with 5/5 strength.  No sensory deficits
> perceived in the left lower extremity.
>
> Brief Hospital Course: The patient did quite well.  She actually improved her strength to
> the point where she was able to ambulate without difficulty.  She had lost the numbness
> and strength was almost to normal levels in her left upper extremity, left lower extremity.
> She still retained the left facial droop, however.  The patient was optimized for blood
> pressure as well with hydrochlorothiazide and also, secondary to funding issues, believe
> this would be medication she would be able to afford.  Also, she is going to be placed on
> gemfibrozil and aspirin.  Aspirin will be used for stroke prophylaxis secondary to
> funding issues as well.  The patient has lost her Medicaid status and will attempt to get a
> gold card, to follow-up in the [LBJ] clinic.

8

Procedures: The CT scan of her brain was negative.  The MRI/MRA showed a right coronal radiate ischemic infarct.  Two-D echo results are pending.  Her total cholesterol was 205, LDL was 138, HDL 35, triglycerides 160, hemoglobin A1C 5.9.

Discharge Instructions: The patient was advised to continue an American Heart Association diet.  She is going to follow-up with her primary care physician hopefully in one to two weeks.  Follow-up with the stroke service at [LBJ] clinic in one to two months, preferably after she obtains a gold card.  The patient was given the number and instructions for this.

The patient is instructed to call 911 for any new emergencies, any deficits in her arms or legs which she notices.  The patient was discharged in good condition, able to ambulate without difficulty, eating without difficulty as well.  She was admitted with an NIHSS total score of 5 and will be discharged with a score of 2, including just for facial paresis at this point.  The patient is going to get physical therapy and occupational therapy as needed.  She declined inpatient physical therapy and rehab at this point, she felt she could go home without this. (Tr. 171-172).

Harris County Hospital District Outpatient Records indicate that Jones has been to many healthcare facilities beginning in June 2004 following her stroke.  Each time she was examined, the physician diagnosed her with the similar conditions, including some, if not all, of the following: hypertension, depression, obesity, high cholesterol, peripheral neuropathy, post status CVA, post stroke depression, shoulder pain and lower back pain.

On June 14, 2004, Jones was examined for alleged problems related to her stroke.  The physician diagnosed Jones with hypertension, CVA (late effects), and right shoulder pain.  (Tr. 231).  She was prescribed medication for the pain.  Her examination also indicated high blood pressure and expressive aphasia.  *Id.*  On August 20, 2004, Jones was again diagnosed with hypertension, status post CVA, post stroke depression, and lower back pain.  (Tr. 230).

On October 4, 2004, Jones submitted herself to an Internal Medicine Consultative Examination performed by John Norris, M.D. at the Medical Testing and Examinations Center of Houston for the Texas Rehabilitation Commission, Disability Determination Services.  (Tr. 207).  The examination by Norris revealed the following:

9

GENERAL: General appearance at the start where she was laying flat on her back and examination table and was reluctant to shake my hand or to acknowledge my presence or to speak.  As we took history from the niece she became more a part of it and began talking and answering questions.  Throughout the interview she seemed somewhat reluctant to talk.  She became teary several times during the interview and at times she appeared confused, was withdrawn and occasionally would stare off into space.

HEENT: Examination of the eyes reveals pupils, which are round, equal and react to light.  The optic fundi showed no significant abnormalities.  There was apparent slight weakness of musculature of the left side of her face.

NECK: Revealed no goiter and no bruits.

LUNGS: Clear.

CARDIAC: Revealed no murmurs.  The rhythm was regular.

ABDOMEN: Revealed no masses or enlarged organs.  There was no tenderness.

BACK: Examination of back revealed normal range of motion.

PULSES: Peripheral pulses present and equal bilaterally.

EXTREMETIES: Revealed no edema.  The range of motion was okay, except for some limitation of the hips and knees.  There were no specific joint effusions or instabilities.  There was modest weakness of the legs, but arm strength was physiological [sic].

SKIN: Revealed no significant abnormalities.

MUSCULOSKELETAL: Please see Range of Motion Chart.  Revealed she needed help getting off the examination table because of generalized back pain.  She walked about the room very slowly but without specific limp.  She can walk a short distance on her tiptoes.  She had good finger control.  No specific atrophy was noted

NEUROLOGICAL: Revealed straight leg raising 70 degrees bilaterally both supine and seated.  The cranial nerves are intact.  DTRs were 3+ and equal bilaterally.

LABORATORY RESULTS: Lumbar spine.  AP and lateral views of the lumbar spine are taken.  There are no significant abnormalities of alignment.  The lumbar intervertebral spaces are maintained.  Sacral iliac joints showed no significant abnormalities.  No significant hypertrophic or destructive changes are noted.

CLINICAL IMPRESSION:

1.      History of hypertension-on medication-blood pressure today 172/92.  Eye grounds okay.

2.      4 ½ month history of apparent CVA.  Current abnormal physical findings include only slight facial weakness.  There is also difficulty with comprehension and a peculiar affect, which may be either from the stroke or emotional response to it.  (She is taking Lexapro).  I could not detect any frank abnormality of the extremities at this time.

3.      Back pain and shoulder pain-etiology unclear-physical examination not particularly remarkable.  (Tr. 207-212).

On October 25, 2004, Jones continued her ongoing medical visits with the Harris County Hospital District.  She was examined and again diagnosed with hypertension, depression, and increased cholesterol.  (Tr. 229).  On February 2, 2005, Jones was treated for hypertension, depression, status post CVA, and increased cholesterol.  (Tr. 227, 260).  Her lab report indicates that she possessed low potassium levels and high glucose.

On April 21, 2005, Jones was examined by Dr. Radhika Ramesh Hariharan, who noted that Jones seemed "tense and fearful."  (Tr. 259).  Hariharan also diagnosed Jones with hypertension, status post CVA, post stroke depression, and increased cholesterol.  On June 9, 2005, Jones was examined because of her increased difficulty in walking and ongoing depression.  She was once again diagnosed with hypertension, post stroke depression, obesity, and increased cholesterol.  (Tr. 258).  On August 5, 2005, Jones was examined and the physician noted that Jones had "worsening depression," hypertension, and status post CVA.  (Tr. 257).

On August 8, 2005, Jones was seen because she heard "voices telling her to kill herself" and because of other complaints of pain.  (Tr. 256).  The doctor noted Jones' lack of sleep, decreased concentration, her weight gain due to increased appetite, and memory problems.  Despite her apparent conditions, the physician observed that Jones "kept eye contact" and had "no motor problems."  *Id.*  The primary diagnosis was major depressive disorder with psychotic

features as a result of post stroke depression, status post CVA, and hypertension.  *Id.*  The

attending physician prescribed her Citalopram for her depression, Geodon for her psychosis, and

Trazodone for her insomnia, along with other various pain medications.  *Id.*

On October 6, 2005, Jones was diagnosed with hypertension, depression, status post

CVA, peripheral neuropathy, and obesity (Tr. 255); and again on March 10, 2006, she was

diagnosed with hypertension, depression, increased cholesterol, status post CVA, obesity, and

peripheral neuropathy.  (Tr. 326).

On April 13, 2006, Jones underwent an examination for back pain and a burning

sensation in her leg.  (Tr.372).  She was diagnosed with lumbar radiculopathy, hypertension, and

depression.  *Id.*  Her doctor's note from the Harris County Hospital District reechoed the

diagnosis, suggesting that she was unable to sustain gainful employment.[3]  (Tr. 368). There was

no change in her condition on June 8, 2006, when Jones returned for a follow-up examination.

(Tr. 371).  The doctor again recognized the hypertension and lumbar problems, particularly

noting Jones' depression.  *Id.*

As part of her application for benefits, Jones alleges shoulder pain in her list of severe

physical impairments.  The record reveals that Jones received multiple magnetic resonance

images ("MRI") on January 14, 2004, related to pain in her left shoulder.  (Tr. 168).  The MRI

indicated that Jones had mild tendinitis and tendinosis in the various inner-regions of the

shoulder, but no serious tears.  (Tr. 168-169).  The MRI record demonstrates the existence and

---

[3]      This suggestion by Jones' physician is given very little weight since the objective
medical evidence does not support such a finding.  *See below* Diagnosis and Expert Opinions.

extent of a past history associated with her shoulder pain, but is not determinative of whether or not benefits should be given to Jones.

It should also be noted that in medical evaluations conducted by DDS examiner John Wright and Bonnie Blacklock, M.D., the Social Security Administration made its own determination that Jones suffered from "late effects of cerebrovascular disease" and "essential hypertension." (Tr. 20). DDS examiner Linda Brawley and James Wright, M.D., agreed with the prior findings and also diagnosed Jones with the same conditions. (Tr. 21).

Dr. Blacklock's residual functional capacity assessment on February 9, 2005, indicated that Jones could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for about 6 hours in a 8-hour workday, sit for about 6 hours in an 8-hour workday, and could push and/or pull without significant limitations. (Tr. 233). Blacklock further notes:

> 50-year-old female alleging back, HTN, stroke, obese.
> CE n 10/4/04.
> 66", 210 lbs. BP 172/92. 20/50 OU with correction.
> Some ROM limitation hips & knees. Modest weakness of legs. "Needed" help getting on & off exam table due to pain. Walk slow but no limp. Can walk short distance on tiptoes. Good finger control. No atrophy. DTR's 3+ & symmetrical. L-spine XR: no significant abnormalities.
> [And in handwriting, the doctor scribed:] While in hospital for stroke, she almost completely recovered neurologically. *Id.*

Dr. Blacklock also observed that Jones suffered from no postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. 234-36). Finally, Dr. Blacklock noted that the symptoms alleged by Jones were only "partially supported" by her impairments. (Tr. 237).

Since depression and mental impairments were also discussed in many of the medical evaluations, the objective medical evidence would not be complete without inclusion of Jones' psychiatric examinations. As noted earlier, Jones has been prescribed numerous medications

relating to her psychological impairments, including Citalopram for depression, Geodon for psychosis, and Trazodone for insomnia.  (Tr. 256).  As of the hearing date, it is this Court's observation that she has continued to take those medications.  (Tr. 389).

Although of slight determinative value, the record indicates that a psychological evaluation took place on November 6, 2002 when Jones was examined by Dr. Stanley D. Smoote. (Tr. 165).  This examination was the result of a past failed attempt at applying for benefits in 2002, based upon Jones' belief that she "[heard] voices, dead people [were] trying to kill her, and [that] she [had] problems remembering."  *Id.*  In administering two tests, WAIS-III and WRAT-3, Dr. Smoote made the following determinations of Jones' mental status:

> General Appearance: Jacqueline is a 48-year-old female who looks her age.  Hygiene appeared good.

> Attitude and Behavior: Jacqueline sat at the table with her eyes closed for much of the evaluation.  She was generally cooperative.

> Mood and Affect: Mood and affect appeared appropriate to content of speech.

> Special Preoccupations: Jacqueline denied current suicidal ideation.  She stated that she hears voices telling her that they are going to kill her.  She said these voices started when she was a little girl.  Jacqueline reported that she sees dead people and the devil.

> Stream of Mental Activity: Jacqueline responded appropriately to question asked.

> Orientation: Jacqueline was unable to provide the day of the week or the date.  She was able to provide her address, but not her telephone number.

> Memory: Jacqueline was able to provide her date and place of birth, but could not recall her age.  She was unable to provide the names of the President and the Mayor.  Concerning short-term memory, she was able to repeat four digits forward and two in reverse.

> Insight Judgment, Judgment: Insight and judgment appeared limited.  (Tr. 165-166).

Dr. Smoote also made the following determination regarding her intellectual assessment:

> Jacqueline's Full Scale IQ fell in the Intellectually Deficient range at the 0 percentile. Her Verbal skills fell in the Intellectually Deficient range at the .1 percentile and her nonverbal functioning fell in the Intellectually Deficient range at the .1 percentile. Jacqueline did not appear motivated and had to be encouraged to respond. [Jones' Verbal IQ was 48, Performance IQ was 48, and Full Scale IQ was 50.]  (Tr. 166).

The assessment concluded that Jones could read at the third grade level and her spelling and arithmetic scores were at the first grade level.  Dr. Smoote also ruled out mental retardation as a diagnosis.  Her Global Assessment of Functioning (GAF) score was 65, which Dr. Smoote determined would remain constant into the future. (Tr. 167).

Jones submitted herself to another psychological evaluation on January 24, 2005, which was administered by Sheila A. Jenkins, PH.D.  (Tr. 213).  The results of the examination were discussed by Dr. Jenkins:

> INTELLIGENCE:
> Ms. Jones was functioning in the intellectually deficient range of intelligence.  She obtained a Full Scale I.Q. score of 51 on the WAIS-III which appears to be an accurate estimate of her current level of functioning.  This IQ provides an assessment of general intelligence and of general occupational and scholastic aptitude.  Ms. Jones obtained a Verbal IQ of 54, which provides an indication of her verbal abilities, which include language comprehension and expression, recall of information, and the ability to reason with words.  Ms. Jones's Performance IQ of 56 contributes an understanding of her perceptual organization, which reflects certain perceptual-motor skills as well as the ability to employ visual images in thinking and to process visual material efficiently.  Her Performance IQ exceeds her Verbal IQ by 2 points, a difference that is not statistically significant.  (Tr. 217).

Dr. Jenkins continues:

> ACADEMIC:
> Reading recognition and spelling of increasingly complex words were at the 3rd and 2nd grade level, respectively.  Ms. Jones was only able to read and spell simple words. Arithmetic was at the 1st grade level.  She could solve math problems involving simple addition.  She did not demonstrate any understanding of problems involving subtraction, multiplication, division, fractions and percentages.  Ms. Jones's intelligence scores are consistent with her academic scores.  This indicates that Ms. Jones has no learning disability.

> PERSONALITY:

Ms. Jones completed the Bender Gestalt Visual Motor Test and the Benton Visual Retention Test. She made the following types of errors: omissions, distortions, rotations, misplacements, and size. These errors are associated with moderate impairment in visual perception and visual memory.

**FUNCTIONAL/ADAPTIVE BEHAVIORS**:
To assess Ms. Jones functional and adaptive skills, she was asked to give an account of those behaviors that she performs and does not perform. According to Ms. Jones, she does not brush her teeth without assistance, put shoes on correct feet without assistance, dress herself completely without assistance, bath or shower without assistance, use spoon, fork, knife competently, make her own bed, follow commands, or answer the telephone. She does not understand denomination (penny, nickel, dime, quarter), understand dollar bills, know emergency telephone number, tell time on standard or digital clock, help with chores around the house, or look both ways before crossing the street. She does not shop for groceries, use a stove or microwave oven for cooking, prepare meals, or look after her own health. The claimant does not manage money without assistance or manage a bank account responsibly.

Based on the data gathered during this evaluation, Ms. Jones's assessment of her functional/adaptive skills appears to be accurate. Thus, the claimant has severe deficits in the area of functional and adaptive skills. (Tr. 217-218).

Finally, Dr. Jenkins concludes in her summary:

Jacqueline Jones is a 50-year-old woman who was evaluated to determine her current level of psychological functioning. She alleges that she is unable to work due to memory problems, confusion, and history of stroke. Medical records from May and October of 2004 revealed the claimant has a medical history of ischemic stroke and hypertension. Also, it was found that Ms. Jones experiences weakness numbness of her extremities. Results indicate that Ms. Jones's intellectual functioning is in the intellectually deficient range. Her IQ and achievement scores are consistent, which indicates no learning disability. Additional findings indicate that Ms. Jones experiences moderate impairment in visual perception and visual memory and severe deficits in the area of functional and adaptive skills. A diagnosis of mental retardation could be considered if she provides supportive documentation that indicates impairment. Given the results, a diagnoses of Dementia NOS and Post Traumatic Stress Disorder are offered at this time. The diagnoses impair her ability to engage in substantial gainful activity. (Tr. 218).

Dr. Jenkins diagnosis included Dementia NOS, Post Traumatic Stress Disorder, and Borderline Intellectual Functioning. By this point, Jones' GAF score was 50, which was 15 points lower than her GAF in 2002. (Tr. 219).

16

On June 24, 2005, Jones underwent another psychiatric review.  This time she was

examined by J.D. Marler, Ph.D.  Dr. Marler opined:

> 50-year-old female alleged stroke, slow learner, memory loss, anxiety.  Claimant attended consultative exam on 1/24/05.  She obtained IQ scores [consistent with Mental Retardation].  However, other evidence in file suggested that the claimant's functional capacity was at a higher level than she presented at the examination.  The case was referred to CDI for possible fraud or similar fault.

> Review of all other EOR as well as the findings from the CDI investigation indicates that the claimant's ability to function is not significantly affected by the CVA she experience in 5/04.  In addition, there is no evidence to support the claimant's presentation at other CEs that she has psychosis, PTSD, or depression.  The claimant has indicated to CEPs that she had never had any psychiatric or psychological treatment and she is on no medication for any of the alleged symptoms she is reporting.

> Therefore, in the absence of any other evidence, it is assessed that the claimant has no mental medically determinable impairment.  (Tr. 252).

On October 27, 2005, Dr. Chappuis Michele reached a similar conclusion:

> Total evidence in file demonstrates no significant mental MDI.  The legal evidence in file dated 6/17/05 [Investigation by the Houston Cooperative Disability Investigations unit] supersedes the 1/05 CE and the longitudinal medical evidence shows that there is no credible objective evidence to support any mental MDI.  Allegations are not credible.  (Tr. 279).

Having considered the objective medical evidence in the record, particularly the

psychological evaluations from 2005, revealing that she has no learning disability despite her

impaired social functioning, medical evaluation records from late 2004 and the discharge

summary from May 2004, indicating normal recovery with nothing remarkable and only slight

facial weakness, the objective medical evidence does not support a conclusion that Jones is

unable to engage substantial and gainful employment as a result of her history of hypertension,

the late effects of her CVA, her weak memory, her depression, or low IQ scores.  While Jones

suffers from a number of severe impairments, and although her mental ability may impair her

social functioning, there is no objective medical evidence to suggest that Jones' impairments, or

combination of such, render her unable to engage in any type of gainful employment.  Thus, the objective medical evidence factor weighs in favor of the ALJ's decision that Jones is not disabled within the meaning of the Act.

### B.  Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.   Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight."  *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability.").   In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).   For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).   Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'"

18

*Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

There are five expert medical opinions in the record: (1) the residual functional capacity assessment completed by Dr. Bonnie Blacklock on February 9, 2005, from her review of Jones' medical records (Tr. 232-239); (2) a written report and opinion by Dr. John Norris, who conducted a consultative examination of Jones on October 4, 2004 (Tr. 207-212); (3) a written report and opinion by Dr. Sheila A. Jenkins, who conducted a psychological evaluation of Jones on January 24, 2005 (Tr. 213-219); (4) the opinion offered by the testifying impartial medical expert Dr. Daniel W. Hamill[4], at the hearing held on July 27, 2006 (Tr. 396-408); and (5) the opinion from the treating physician of the Harris County Hospital District dated April 13, 2006 (Tr. 368, 372).

Dr. Blacklock, in the written Residual Functional Capacity Assessment she completed on February 9, 2005, opined, from her review of Jones' medical records through that date, that Jones could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand or walk for about 6 hours in a 8-hour workday, could sit for about 6 hours in an 8-hour workday, and could push and/or pull without significant limitations.  (Tr. 233).  Dr. Blacklock further wrote that although there were some limitations with Jones' hips and knees, the weakness in her legs was "modest," and there were "no significant abnormalities" with her spine.  *Id.*

Dr. John Norris, in his written report to the Texas Rehabilitation Commission on October 4, 2004, opined that although Jones had a 4 ½ month history of apparent CVA, the current

---

4

    In its decision, the ALJ mistakenly referred to Dr. Dan Hamill as Dr. Dan Hamilton, however, the content of the testimony by the doctor was not mistaken, as indicated in his decision.  (Tr. 17).

abnormal physical findings included "only slight facial weakness."  He further noted that Jones

had difficulty with comprehension and a peculiar affect, which may have been either from the

stroke or emotional response to it. Otherwise, Norris "could not detect any frank abnormality of

the extremities." Norris concluded by stating that the physical examination of Jones' back and

shoulder did not reveal anything "particularly remarkable."  (Tr. 207-212).

　　　Dr. Jenkins, in her report of Jones' psychological evaluation conducted on January 24,

2005, opined:

> Jacqueline Jones is a 50-year-old woman who was evaluated to determine her current
> level of psychological functioning.  She alleges that she is unable to work due to memory
> problems, confusion, and history of stroke.  Medical records from May and October of
> 2004 revealed the claimant has a medical history of ischemic stroke and hypertension.
> Also, it was found that Ms. Jones experiences weakness numbness of her extremities.
> Results indicate that Ms. Jones's intellectual functioning is in the intellectually deficient
> range.  Her IQ and achievement scores are consistent, which indicates no learning
> disability.  Additional findings indicate that Ms. Jones experiences moderate impairment
> in visual perception and visual memory and severe deficits in the area of functional and
> adaptive skills.  A diagnosis of mental retardation could be considered if she provides
> supportive documentation that indicates impairment.  Given the results, a diagnoses of
> Dementia NOS and Post Traumatic Stress Disorder are offered at this time.  The
> diagnoses impair her ability to engage in substantial gainful activity.  (Tr. 218).

Dr. Jenkins also wrote that Jones suffered from Borderline Intellectual Functioning. (Tr. 219).

Although Dr. Jenkins stated in her observation that such conditions *impair* Jones' ability to

engage in substantial gainful activity, the ALJ decision did not contradict Jenkins' determination

since it only *limited* the type of gainful activity which Jones could perform.  (Tr. 17-18).

　　　Dr. Hamill, in his testimony at the hearing held on July 27, 2006, stated that despite

"scant evidence" on the "mental side of the case," there are two diagnoses: borderline

intellectual functioning and depressive disorder.  (Tr. 398).  Dr. Hamill recognized the

provisional mental retardation diagnoses found in the record, but said there are issues with the

validity of the testing, and that the "reasonably medically probable" diagnosis is closer to

borderline intellectual functioning.  *Id.*  In Dr. Hamill's opinion, Jones' condition does not meet or equal any of the Commissioner's listings for mental impairments.  (Tr. 399).  Dr. Hamill further stated that in listening to Jones' testimony and with respect to the investigative reports regarding inconsistent statements by Jones, that it is "reasonably probable" that the diagnoses are accurate.  *Id.*  Dr. Hamill also said that the depressive disorder could be diagnosed from Jones' difficulty thinking and concentrating, and her suicidal ideation.  *Id.*  In describing Jones' limitations, Dr. Hamill said that "understanding and carrying out detailed or complex instructions are precluded" by her condition, and that he would limit Jones to "very simple, repetitive 1, 2, 3 step tasks."  *Id.*  Dr. Hamill further stated that he did not believe that she would "meet the public well," and that given her "impaired stress tolerance," he would not assign her to any assembly line or mass production pace. (Tr. 400).  Her prognosis for mental improvement would be "fair with appropriate treatment compliance."  *Id.*

Moreover, Dr. Hamill explained, in recognizing the low IQ scores from the 2002 evaluation conducted by Dr. Smoote and the most current examination by Dr. Jenkins, along with the provisional diagnoses of ruled-out mental retardation, that doctors did not find that Jones was mentally retarded because there was no evidence of a functioning impediment or onset before the age of 22 and the evidence of the investigative report suggested Jones had levels of functioning higher than disclosed to the psychologist.  (Tr. 401).  His opinion was based on his expertise, experience and the impression he received from Jones' testimony.  (Tr. 402-407).  Given the evidence in the record, his opinion that Jones suffered from borderline intellectual functioning is not inconsistent with the findings by Dr. Jenkins or Dr. Smoote.

The treating physician at the Martin Luther King Health Center of the Harris County Hospital District, in a letter dated April 13, 2006, opined that due to Jones' lumbar radiculopathy

and major depression, Jones was unable to sustain gainful employment.  (Tr. 368).  The ALJ considered the opinion of the treating physician, but ultimately gave it little weight because it was not supported by the objective medical evidence of the record.  (Tr. 18).

The ALJ, in his written decision, found that Jones had numerous severe impairments, including back pain, hypertension, status post cerebral vascular accident, major depression and borderline intellectual functioning.  (Tr. 16).  The ALJ further found that none of Jones' impairments, either singly or in combination, met or equaled a listing.  The ALJ wrote:

> Although the claimant suffered a CVA in May 2004, the medical evidence of record shows that the claimant's only residuals was some facial paresis.  Also no significant abnormalities are found in the objective medical evidence regarding the claimant's back pain and limitations.

> Upon review of the medical evidence regarding the claimant's depressive disorder and borderline intellectual functioning; Dr. Dan Hamilton [sic], Ph.D., the psychological expert, testified that the claimant's impairments did not meet or equal Listing level severity.  He further testified that although the medical evidence reported that the claimant had low IQ scores ranging in the 50's and 60's; there is no evidence that this developmental onset occurred before the claimant attained age 22.

> Since the claimant has been shown to have a medically determinable mental impairment, the undersigned must substantiate the existence of a mental disorder and establish the severity of the functional limitations associated with the mental disorder which are incompatible with the ability to work.

> The undersigned has considered the area of "activities of daily living," which include adaptive activity such as cleaning, shopping, cooking, driving, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephone directories, using the post office, etc. The claimant testified that she lives with her family and testified that her family cooks and cleans for her.  However, she also testified that she is able to work part-time as a home health provider.  The undersigned has found no limitation in this area.

> The second area of consideration is "social functioning," which refers to an individual's capacity to interact appropriately and communicate effectively and on a sustained basis with others.  The claimant testified that she visits friends occasionally and attends church monthly. The undersigned has found a moderate limitation in this area.

The third area of consideration is "concentration, persistence or pace." This refers to the ability to sustain focused attention and concentration sufficiently long to permit timely and appropriate completion of tasks commonly found in work settings. The claimant testified that she has problems concentrating with memory loss. The medical evidence reveals that the claimant has borderline intellectual functioning. The undersigned has found a moderate limitation in this area.

The last area of consideration is "episodes of deterioration or decompensation." This refers to exacerbations or temporary increases in symptoms or signs accompanied by a lost of adaptive functioning. "Repeated episodes of decompensation, each of extended duration," means the episodes within 1 year or an average of once every 4 months, each lasting for at least 2 weeks. There is no evidence in the record of episodes of decompensation, each of an extended duration. The evidence does not establish the presence of the "C" criteria. (Tr. 16-17).

The ALJ then determined that Jones has the "residual functional capacity to [perform] medium work with no detailed or complex work (1-3 steps, simple and routine work) at a non-assembly line pace; and only occasional interaction with the general public." (Tr. 17). Finally, the ALJ stated that Jones is capable of "performing past relevant work as a garment sorter and a home health provider." (Tr. 18).

The determinations of the ALJ may appear to be inconsistent with the opinion of Jones' treating physician at the Harris County Hospital District, as pertaining to Jones' physical limitations; however that opinion, as found by the ALJ, is not supported by objective medical evidence on record. Furthermore, although Jones alleges in her Motion for Summary Judgment that the IQ scores determined by Dr. Jenkins were not adequately addressed by the ALJ (meaning they may have indicated she was mentally retarded), *see* Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment (Document No. 16) at 3-5, the ALJ appropriately accepted the substitute diagnosis of borderline intellectual functioning based upon "more than a scintilla" of evidence that (1) Jones' level of functioning was higher than what was initially revealed, (2) there was no documented onset of mental retardation before age 22, and (3)

her inconsistent behavior and statements on record put her credibility at issue. Thus, the determination of the ALJ is consistent with the opinion of the medical experts, and the diagnosis and expert opinion factor weighs in favor of the ALJ's decision.

### C.  Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is `constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala,* 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Jones testified at the hearing before the ALJ that she can no longer work as a result of her inability to bend or stand up for long periods of time, her back pain, a burning sensation in her feet, her difficulty with thinking, memory, and concentration, and her depression.  (Tr. 381, 387).  Jones further testified that she "sometimes hears voices," and that she is taking medication for her depression, but that it gives her occasional headaches.  (Tr. 388-389).  Jones also told the ALJ that she suffers from high blood pressure.  (Tr. 390).

As to her exertional abilities, when asked how long she could stand at one time, Jones replied: "'Bout, 'bout 15 minutes.  For 10 to 15 minutes.  I just can't stand straight up all the time, and I can't bend, like if, like if a lady tell me to go clean out the tub, want me to go in there and clean the bathroom up, my back be hurtin' real bad so I can't."  (Tr. 391).  She also testified that she has difficulty sitting, trouble using her hands or arms to reach, grip, and manipulate things, as well as problems with lifting heavy objects.  *Id.*

The ALJ, in considering Jones' subjective complaints, her professed exertional limitations, and her depression, found Jones only generally credible.  In his decision, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to [perform] medium work with no detailed or complex work (1-3 steps, simple and routine work) at a non-assembly line pace; and only occasional interaction with the general public.

> In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p.  The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p and 96-6p.

> The claimant testified that she is unable to work due to back pain, high blood pressure and mental problems.  She testified that she can read sometimes, but cannot read a newspaper, however she testified that she reads the Bible.  She doesn't spell well and

25

can't do basic math.  She testified that she does not do housework or shopping.  She visits with relatives and attends church once a month.

Considering the record as a whole, the Administrative Law Judge concludes that the claimant may experience some of the subjective symptoms . . . which she alleges but not to the degree alleged.  The claimant's testimony is an overstatement of her subjective symptoms and functional limitations and is only generally credible.  The claimant has failed to document her record with evidence that would support his [sic] claim of a disabling condition.  There is no objective medical evidence in the record to substantiate the claimant's allegations that she is unable to do any work.  In rejecting full credibility for the claimant's testimony, the undersigned has also been influenced by the "Report of Investigation" (Ex. 4-E), where the claimant was observed to function at a much higher level, both physically and mentally, than she professes in these proceedings.  (Tr. 17-18).

As referenced in the ALJ's decision, the credibility determination was based upon a report conducted by the Cooperative Disability Investigation Unit referred to in the record as "Report of Investigation," and dated June 17, 2005.  (Tr. 112).  As the report states:

The investigation found that the claimant lives with at least two of her children and live-in boyfriend who her daughter referred to as the claimant's husband.  The claimant told investigators that she works, caring for her ill sister.  During the interview with investigators, the claimant did not appear to have any physical problems.  She seemed to ambulate equally well on the left and right sides, both upper body and lower.  She was wearing a medical uniform top (scrubs) during the interview.  When she spoke she was understandable and she did not slur.  It was found that she does the shopping and household chores and she pays her own rent.  The landlord's real estate office is approximately ¾ mile from her apartment and she walks there to pay rent.  It was also found that the claimant is employed by Coastal Medical Services, conducting home health care.  She has worked there since September 2003 and she is still employed there.  Investigators made contact with Coastal and were able to verify that she is employed, earns $6.00 an hour working 20 hours a week and is paid two times a month.  (Tr. 116).

More specifically, the report points to clear evidence that contradicts Jones' petition for benefits.

The report begins with a short review of Jones' alleged basis for physical disability. It states:

On a separate Questionnaire with the same date the claimant reported that she has physical problems that limit what she is able to do.  She stated that she can't use her left hand, can't bend or stoop, and can't walk very far.  She described an average day as sitting down, sleeping and walking as much as possible, which is very little.  According to the claimant, her physical problems limit her ability to: sit, stand, walk, lift, use her

hands, bend, kneel, reach, hear, speak, watch TV, and take care of her personal needs. (Tr. 117).

The report then includes details which contradict Jones' allegations:

> Also present during the interview was a young female, who stated that she was Jones' daughter; another older female who identified herself as Rita Anumele (believed to be Rita Mills), Jones' sister; and a male who Jones said was her boyfriend, Edwin. Early in the interview Jones' daughter was very rude as was Edwin. Edwin stated that he lived there and he made it a point to attempt to control the interview. Throughout the interview Edwin would interrupt and say that Jones had a stroke in the past and that the investigators were going to cause her to have another one. The investigators continued to attempt to talk to Jones and when Edwin was not interfering, she was able to speak for herself in a rational manner and answer questions without anyone's assistance. It was learned that Jones does the shopping and household chores. She shops for groceries at Fiesta and Family Dollar and pays with cash. It was also found that she cares for Rita, who is ill, every day. Usually she goes to Rita's house but they sometimes stay at her house. Jones told investigators that she is like a home health provider.

> *                    *                    *

> During the interview with Jones, the investigators noted that she did not appear to have any difficulty ambulating and she did not exhibit slurred speech. She was able to talk to the investigators and answer questions in a rational matter. She did not appear to be dazed or confused and was very much aware of what was going on. (Tr. 117-118).

As part of the investigators' report, there is a photograph which show Jones starting to read an instruction sheet to the investigators, which she is holding with her hand, as well as a photograph of Jones bending over to pick something up off the floor. (Tr. 122).

The credibility determination of the ALJ finds further support from the Special Determination made by DDS examiner John N. Wright[5]. Dr. Wright found the following:

> The Claimant's treatment of cerebral vascular accident is a material fact that could influence SSA in determining rights to payments authorized by the Social Security Act.

---

[5]       The actual date of Dr. Wright's Special Determination is not accurately identified in the "List of Exhibits." It is deduced that the correct date must be sometime after the Report of Investigation (6/17/05) and before the Disability Determination and Transmittal (6/23/05), *see* Tr. 20, and not 1/25/05 as indicated in the record.

The facts show that she has produced low intelligence scores on two psychological examinations that were conducted in 2002 and 2005.

There is reason to believe that the claimant falsely alleged a severe mental impairment involving depression, memory problems, and being a slow learner. In 2002, she presented to Stanley Smoote, Ph.D. with symptoms of auditory and visual hallucinations and problems with memory. There is no evidence that she is receiving any treatment for psychosis. At the psychological consultative examination in 1/05, she informed panelist Sheila Jenkins, Ph.D. that she suffered from memory problems and confusion that had been occurring over the past several years. She also reported being depressed and having attempted suicide. The claimant does not indicate any current treatment for depression on her SSA-3368 and does not indicate that she is taking any anti-depressants. She reported to Dr. Jenkins that she had never been treated for an emotional or psychological problem.

The claimant attended an Internal Medicine Consultative Examination on 10/4/04. She was reluctant to speak to the examiner, Dr. John Norris, M.D. She presented as confused, withdrawn, and would occasionally stare off into space. In spite of her reported limitations on SSA documents, the only significant finding made by Dr. Norris was slight facial weakness. She also reported back and shoulder pain to Dr. Norris. However, he could not discern anything particularly remarkable during the course of his examination.

There is reason to believe that the claimant falsely alleges disabilities involving her physical and mental functions. The claimant's presentation at her Internal Medicine Consultative Examination suggested perceptual difficulties, but the physical examination revealed no significant limitations. Her presentation at both the 2002 and 2005 psychological examinations appears exaggerated and her performance on intelligence testing is not consistent with her ability to function cognitively. Her ability to function independently has been well demonstrated by the findings of the CDI investigators who observed her as well as the information provided by third party sources who know the claimant. (Tr. 224).

It is within the province of the ALJ to make credibility determinations. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Based on the ALJ's reasoned credibility determination, and the conclusion that such determination is supported by substantial evidence, most particularly the results of the CDI investigation and the objective medical evidence on record, the subjective evidence of pain factor also weighs in favor of the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

The record shows that Jones was fifty-one years old at the time of the administrative hearing, she attended high school until the tenth grade, and has experience working as a home health provider and garment sorter.  (Tr. 378-379, 381, 383).  Based on the objective medical evidence, the ALJ questioned Caroline Fisher, a vocational expert, at the hearing about Jones' ability to engage in gainful work activities.  The ALJ posed three hypothetical questions to the vocational expert which incorporated all of Jones' impairments, which the ALJ found supported by the record.  (Tr. 410-413).  The ALJ asked the Vocational Expert to consider, based on the testimony offered at the hearing, the following hypothetical questions:

> ALJ: . . . For the purposes of the first hypothetical question, let me ask you to assume an individual with no exertional limitations in the duration of 12 months or more.  Assume, however, that I would find that this person would be precluded from performing detailed or complex work, although cognitively capable of simple, repetitive one to three-step operations. Assume that I would find that this person would be limited to no more than occasional interaction with the general public and would [sic] precluded from performing work at a rapid or assembly line pace.  Assuming those limitations, but no others, first of all, could a person so limited perform any of Ms. Jones' past relevant work, either as actually performed or as normally performed in the national and local economies?
>
> VE: Past work could be performed.
>
> ALJ: Both jobs?
>
> VE: Yes, sir.

29

ALJ: And if I should find that in addition to those limitations, there was a, an exertional limitation to medium work, would your testimony be the same?

VE: Yes, sir. It would.

ALJ: For purposes of the 3rd hypothetical question, let me ask you to assume an individual limited exertionally to the performance of no more than light work. Again, assume that I would find that this person would be precluded from performing detailed or complex work, although cognitively capable of one to three-step simple repetitive operations, would be precluded from performing work that would require more than occasional interaction with the general public, and would be precluded from performing work at a rapid or assembly line pace. Assuming those limitations, but no others, could a person so limited perform any of Ms. Jones' past relevant work?

VE: Yes, sir. The job as a home health attendant could not be performed. The job as she described it at Goodwill could be performed.

ALJ: Continuing to assume those limitations, but no others, do you know of other work in the national or local economies that could be performed by someone of her age, education and vocational background who was so limited?

VE: Yes, sir. At the light level, these would be, of course, classified as unskilled as per your hypothetical. Cafeteria attendant could be performed, sales attendant is a person who, for example, picks up and hangs clothes from dressing rooms in department stores; cleaner of offices; stock checker.

ALJ: Do numbers for those jobs exist in the national and local economies?

VE: Yes, sir. Taken all together, those do exist in the national [sic] economy in numbers of some 5,000. And in the national economy, numbers of, oh, a conservative estimate would be 100,000 or more. (Tr. 409-412).

The ALJ then posed a final question to the Vocational Expert, with regard to the testimony given by Jones during the hearing. The ALJ asked:

ALJ: And you've been present during the testimony we've received today. You've heard Ms. Jones' testimony concerning various physical and mental problems that she's described. If I find the testimony fully credible and find that she does experience all of the limitations she's indicated, including the inability to function for more hours a week than she's currently doing, under those circumstances, do you know of a full-time competitive work in the national or local economies that could be performed by somebody of her age, education, and vocational background?

30

VE: No, sir.  (Tr. 412-413).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's . . . hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Id.*

Here, the ALJ relied on a series of comprehensive hypothetical questions to the vocational expert.  Because the hypothetical questions included all and only those impairments borne out by the record, and because it adequately reflected the findings established by the medical records, the ALJ adequately developed the record.

As noted in the discussion of other factors, particularly subjective pain, the ALJ has made the determination that Jones is not wholly credible, and therefore, his decision is consistent with the Vocational Expert's testimony regarding the type of work that Jones is capable of performing.  Because there is substantial evidence in the record to support the ALJ's conclusion that Jones can perform medium work with little or no detailed or complex instructions, and past

31

relevant work, and because the vocational expert testified that Jones could, within the range identified by the ALJ, perform relevant past work as a garment sorter and home healthcare worker and other medium work such as a cafeteria worker or office cleaner, which testimony stands as substantial evidence in and of itself, the final factor of the age, education, and work history also supports the ALJ's decision.

## VI.  Conclusion

Considering the record as a whole, the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directs a finding that Jones was "not disabled."  As such, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 14) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 15) is DENIED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 26th day of June,  2008.

Frances H. Stacy
United States Magistrate Judge